UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
AMANDA MOODY, et al.,

                            Plaintiffs,

v.                                                              **OPINION AND ORDER**

EMPIRE HOTEL DEVELOPMENT, INC.,
et al.,                                                         20-CV-02203 (PMH)

                            Defendants.
-------------------------------------------------------X

PHILIP M. HALPERN, United States District Judge:

Amanda Moody, Kareena R. Guarneri, Dajuan Morrow, William Patterson, Natalia
Richards, Martina Robinson, and De'Jahn Ruffin commenced this action against Hyatt
Corporation, Hyatt Place Franchising, L.L.C. ("Hyatt Franchising"), Hyatt Hotels Corporation
(collectively, the "Hyatt Defendants"), Empire Hotel Development, Inc. ("Empire"), and Erfan
Khan ("Khan," and together with Empire, the "Empire Defendants," and collectively,
"Defendants") pressing claims of discrimination, hostile work environment, and retaliatory
constructive discharge under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §
2000e *et seq.*; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 *et
seq.*; and 42 U.S.C. § 1981.

Kareena Guarneri, Natalia Richards, DaJuan Morrow, William Patterson, De'Jahn Ruffin,
and Defendants thereafter executed settlement agreements. A stipulation of voluntary dismissal of
the claims brought by those plaintiffs was so-ordered by the Court on March 10, 2023. (Doc. 94).
Amanda Moody ("Moody") and Martina Robinson ("Robinson" and together, "Plaintiffs") are the
sole remaining named plaintiffs in this action.

Pending before the Court are Defendants' motions for summary judgment seeking
dismissal of Plaintiffs' claims asserted against them in the Amended Complaint (Doc. 19, "Am.

Compl."). The Empire Defendants and Hyatt Defendants, pursuant to the Court's directive, each filed separate notices of motion (Doc. 81; Doc. 82), together with a joint memorandum of law (Doc. 83, "Def. Br."), a declaration in support (Doc. 84, "Bharj Decl."), and a Rule 56.1 Statement (Doc. 85, "56.1 Stmt."). Plaintiffs opposed (Doc. 86, "Brandt Decl."; Doc. 87, "Pl. Br."), and the motion was fully submitted with the filing of the motion, opposition, and Defendants' reply papers (Doc. 88, "Reply Br.").[1]

For the reasons set forth below, the Hyatt Defendants' motion for summary judgment is GRANTED and the Empire Defendants' motion for summary judgment is GRANTED IN PART.

## **BACKGROUND**

The facts recited below are taken from the Amended Complaint, the Rule 56.1 Statement, and the admissible evidence submitted by the parties.[2]

Khan is the sole owner and President of Empire. (56.1 Stmt. ¶ 1). On January 29, 2016, Empire entered into a franchise agreement (the "Franchise Agreement") with Hyatt Franchising to construct, own, and operate a hotel in Poughkeepsie, New York known as the "Hyatt Place Poughkeepsie" (the "Hotel"). (*Id.* ¶ 3). On May 8, 2019, prior to its opening to the public, Robinson

---

[1] Defendants filed a joint motion to seal certain documents submitted in connection with this briefing. (Doc. 89). Plaintiffs consented to redaction and sealing as proposed by Defendants as those documents contain sensitive business information and/or sensitive personal information. (*Id.*). The Court finds that the narrowly tailored, limited redactions made to those documents satisfy the standards articulated by the Second Circuit in *Lugosch v. Pyramid Co. of Onondaga*, 435 F. 3d 110, 120 (2d Cir. 2006), and accordingly, the motion to seal is granted.

[2] The Local Rules of the United States District Courts for the Southern and Eastern Districts of New York instruct that a "paragraph in the [movant's] statement of material facts . . . will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local Civil Rule 56.1(c). Furthermore, "[e]ach statement by the . . . opponent . . . including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible . . . ." *Id.* at 56.1(d). Thus, the Court deems Defendants' statements of fact admitted unless specifically controverted by Plaintiff and supported by evidence. *Brooke v. Cnty. of Rockland*, No. 17-CV-03166, 2021 WL 809320, at *2 (S.D.N.Y. Mar. 3, 2021), *aff'd*, No. 21-598-CV, 2022 WL 6585350 (2d Cir. Oct. 11, 2022).

applied for a job at the Hotel. (Bharj Decl., Ex. 4-A). Robinson was hired on the spot after interviewing with Housekeeping Manager Marita Sulollari ("Sulollari"). (*Id*., Ex. 4-A; *id*., Exs. 4, 5, "Robinson Tr." at 48:6-9). Moody interviewed for a job at the Hotel on June 10, 2019 with General Manager Sayed Alam ("Alam"), was also hired on the spot, and started working at the Hotel as a cook a couple of days later. (56.1 Stmt. ¶¶ 71-72). Plaintiffs each began working at the Hotel prior to its opening to put together furniture, set up the guest rooms and common areas, and clean up from the construction. (Bharj Decl., Exs. 1, 2, 3, "Moody Tr." at 126:8-18, 128:20-131:17, 133:5-134:19, 137:25-138:12, 139:23-140:8; Robinson Tr. at 52:4-53:19, 77:18-80:16).

I.    Hyatt Corporate Trainer Inthirajvongsy

On June 18, 2019, two Hyatt corporate trainers, Jordan Inthirajvongsy ("Inthirajvongsy") and Andres Gonzalez ("Gonzalez" and together, the "Corporate Trainers") visited the Hotel for one week to conduct a Brand Standards Training. (56.1 Stmt. ¶ 50). The Corporate Trainers started the training sessions each day with a group session including all of the Hotel's hourly staff. (*Id*. ¶ 42). After the group session, employees trained with either Inthirajvongsy or Gonzalez. (*Id*.). Inthirajvongsy trained front-of-the-house staff (i.e., kitchen and front desk staff) and Gonzalez trained the back-of-the house staff (i.e., housekeeping). (*Id*. ¶ 40).

Plaintiffs contend that Inthrajovongsy stereotyped the African American employees and treated them in a mocking and disrespectful manner. (Am. Compl. ¶ 22). Plaintiffs testified that Inthirajovongsy used slang words and adopted exaggerated mannerisms only when referring to the employees of color, referring to the Hispanic employees as "the mamis" and making them the brunt of her jokes about understanding English comprehension, and changing her accent and mannerisms depending on the ethnicity of the employee being addressed, except when referring to the white employees, to whom she employed no special accent or slang. (Moody Tr. at 221:8-

3

222:17, 376:8-19). Moody recalled Inthrajovongsy directing her attention to the African American employees when stating "your uniform needs to be tight and clean, don't tuck nothing in, no one wants to see your big old hips and butt," and demanding that a male, African-American employee tuck in his gold chain, in addition to performing a caricature of a "Chinese nail lady." (*Id*. at 218:9-22). Robinson testified that Inthrajovongsy was "rude" in that she segregated the African American employees to work in the back of the kitchen cooking, doing dishes, and cleaning, while Caucasian employees were put in the front to clean tables; and she used slang and different accents when addressing employees of different races. (Robinson Tr. at 233:25-234:8, 235:10-14, 284:18-286:20). Christina Soto ("Soto"), the Hyatt Sales Director who was later appointed as the Hotel's General Manager, testified that she heard Inthrajovongsy "mimic some celebrities" using "slang." (Brandt Decl., Ex. B, "Soto Tr." at 235:3-15).

On June 25, 2019, the Hotel opened to the public. (*Id*. ¶ 50). Plaintiffs contend that the staff posed for a group picture in the hotel lobby to commemorate the opening and that Inthrajovongsy arranged the employees by race for the photo. (Am. Compl. ¶ 23; Moody Tr. at 222:18-223:8; Robinson Tr. at 234:9-14, 242:5-25, 248:9-16).

The Corporate Trainers left the Hotel on June 25, 2019 at the conclusion of the training, they have not returned, and have since had no involvement in the Hotel's operations. (56.1 Stmt. ¶ 50).

II.     Housekeeping Manager Sulollari

Plaintiffs contend that throughout their employment, they were subjected to racial slurs and other derogatory treatment by Sulollari, who addressed the African American employees in an aggressive and demeaning tone, while not treating their co-workers of other races in a similarly hostile manner. (Moody Tr. at 376:17-377:5; Robinson Tr. at 128:9-129:12). Sulollari reportedly

4

referred to African American employees as "you people" and used the "N-word" on multiple occasions. (Moody Tr. at 376:20-22; Robinson Tr. at 128:9-131:21). Soto testified that she was aware of "rumors" that Sulollari was "saying wrong things like 'you people,'" and that another employee, Kareena Guarneri, had barged into Soto's office to complain about Sulollari's use of the "N-word." (Soto Tr. at 69:6-25). Moody never actually heard Sulollari use the "N-word" and neither Moody nor Robinson themselves reported Sulollari's use of offensive language to management, though Moody did complain to Soto who reported problems between Moody and Sulollari to Alam. (Moody Tr. at 377:9-13; Robinson Tr. at 133:15-134:2; Soto Tr. at 193:13-196:7).

I.     Moody

Moody, who identifies as African American, worked for Empire at the Hotel for approximately 33 days from around June 14, 2019 until July 17, 2019. (56.1 Stmt. ¶ 85; Am. Compl. ¶ 10; Moody Tr. at 105:13-16, 184:17-18.).  Moody was hired as a cook and worked in the kitchen with two other employees, Trinidad McPhun ("Trinidad") and Hanan Aithouna ("Hanan"). (56.1 Stmt. ¶ 72; Moody Tr. at 163:16-25).

Shortly after the Hotel opened, the kitchen became short-staffed because Trinidad left Empire mid-shift, and Moody and Hanan remained as the only two kitchen employees. (Moody Tr. at 180:8-22, 203:22-204:16, 186:16-187:2). As a result, Moody worked longer hours and did not get days off. (*Id*. at 184:9-185:4). Recognizing Moody's hard work, Alam promoted her to kitchen manager and increased her pay to $15/hour. (*Id*. at 317:10-318:9; 56.1 Stmt. ¶¶ 74-75). To alleviate the staffing issues and Moody's workload, Alam later rehired Trinidad as kitchen manager and changed Moody's title from kitchen manager to cook, but paid Trinidad less than Moody. (Moody Tr. at 231:12-232:17, 326:5-9). Moody resigned in light of that demotion. (Am.

5

Compl. ¶ 42; 56.1 Stmt. ¶ 85; Moody Tr. at 228:5-12, 234:5-13). On July 17, 2019, Moody texted Manmeet Singh ("Singh"), the Assistant General Manager, that she was resigning. (Moody Tr. at 378:1-3).

II.    Robinson

Robinson, who identifies as African American, worked at Empire between approximately May 8, 2019 and September 13, 2019, first as a housekeeper and then later at the front desk. (Am. Compl. ¶10; 56.1 Stmt. ¶¶ 54-55; Robinson Tr. at 33:17-34:10, 323:23-324:5, 84:6-85:5; Bharj Decl., Exs. 4-A, 4-B). As a housekeeper, Robinson reported to Sulollari. (56.1 Stmt. ¶ 56). After the Hotel opened, Sulollari moved Robinson from a housekeeping position to the front desk. (*Id*. ¶ 57; Robinson Tr. at 84:6-85:5). Robinson thereafter continued to report to Sulollari, as well as Singh and "Anton" at various times. (Robinson Tr. at 216:4-217:6).

At the end of August to beginning of September 2019, Robinson, together with other Empire employees, met with an attorney. (*Id*. at 100:3-10). Robinson alleges that it appeared that Empire became aware of their legal claims and decision to engage legal representation, because Singh began targeting her with scheduling anomalies. (Am. Compl. ¶ 44; Robinson Tr. at 97:3-98:3, 103:7-22, 121:7-17).

On September 7, 2019, Empire issued Robinson a written warning for failing to report to work on September 5, 2019. (Bharj Decl., Ex. 4-A). On September 11, 2019, Empire prepared a written warning stating that Robinson abandoned her position, left her shift without following the protocol to pass over the night report to the manager, and failed to report to her manager that her point-of-sale bank was short. (*Id*.). Robinson informed Khan by text message on September 13, 2019 that she was quitting because she felt that Singh was targeting her with schedule changes.

6

(Bharj Decl., Ex. 4-B). Empire, on September 20, 2019, prepared a voluntary termination report which states, *inter alia*, that Robinson abandoned her position at will. (Bharj Decl., Ex. 4-A).

This litigation followed.

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Liverpool v. Davis*, No. 17-CV-3875, 2020 WL 917294, at *4 (S.D.N.Y. Feb. 26, 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).[3] "'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud*, No. 12-CV-5486, 2013 WL 1681261, at *1 (S.D.N.Y. Apr. 17, 2013) (quoting *Anderson*, 477 U.S. at 248). "The question at summary judgment is whether a genuine dispute as to a *material* fact exists—not whether the parties have a dispute as to any fact." *Hernandez v. Comm'r of Baseball*, No. 22-343, 2023 WL 5217876, at *5 (2d Cir. Aug. 15, 2023); *McKinney v. City of Middletown*, 49 F.4th 730, 737 (2d Cir. 2022)).

The Court's duty, when determining whether summary judgment is appropriate, is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Id.* (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). Indeed, the Court's function is not to determine the truth or weigh the evidence. The task is material issue spotting, not material issue determining. Therefore, "where there is an absence of sufficient proof as to one essential

---

[3] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

element of a claim, any factual disputes with respect to other elements of the claim are immaterial." *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 234 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006)).

"It is the movant's burden to show that no genuine factual dispute exists." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). The Court must "resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Id.* (citing *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003)). Once the movant has met its burden, the non-movant "must come forward with specific facts showing that there is a genuine issue for trial." *Liverpool*, 2020 WL 917294, at * 4 (quoting *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The non-movant cannot defeat a summary judgment motion by relying on "mere speculation or conjecture as to the true nature of the facts." *Id.* (quoting *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). However, if "there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper." *Sood*, 2013 WL 1681261, at *2 (citing *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)).

Should there be no genuine issue of material fact, the movant must also establish its entitlement to judgment as a matter of law. *See Glover v. Austin*, 289 F. App'x 430, 431 (2d Cir. 2008) ("Summary judgment is appropriate if, but only if, there are no genuine issues of material fact supporting an essential element of the plaintiffs' claim for relief."); *Pimentel v. City of New York*, 74 F. App'x 146, 148 (2d Cir. 2003) (holding that because plaintiff "failed to raise an issue of material fact with respect to an essential element of her[] claim, the District Court

properly granted summary judgment dismissing that claim"). Simply put, the movant must separately establish that the law favors the judgment sought.

"Courts have acknowledged the dangers of summary judgment in discrimination cases: 'Because direct evidence of . . . discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Benson v. Fam. Dollar Stores, Inc.*, No. 12-CV-01457, 2017 WL 11576213, at *3 (N.D.N.Y. Mar. 31, 2017) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citations and internal quotation marks omitted)), *aff'd sub nom. Benson v. Fam. Dollar Operations, Inc.*, 755 F. App'x 52 (2d Cir. 2018).

## ANALYSIS

Plaintiffs each press claims of disparate treatment, hostile work environment, and retaliation under Title VII, NYSHRL § 296, and 42 U.S.C. § 1981. The Hyatt Defendants argue that there is no joint employer liability, and even if there was, Plaintiffs have not established that the Hyatt Defendants are liable for the claims alleged against them. The Empire Defendants argue that Plaintiffs fail to raise a triable issue of material fact as to any of the claims alleged against them and they are entitled to judgment as a matter of law dismissing Plaintiffs' claims. The Court considers Defendants' arguments in turn.

### I.    Joint Employer Liability

"It has long been understood by [the Second Circuit] that the existence of an employer-employee relationship is a primary element of Title VII claims." *Felder v. United States Tennis Ass'n*, 27 F.4th 834, 838 (2d Cir. 2022). An employee is not, however, "squarely limited to claims against his or her *formal* employer." *Id*. (emphasis in original). Rather, in certain circumstances an employee may assert "Title VII liability against a 'constructive employer'—an entity that shares

in controlling the terms and conditions of a plaintiff's employment." *Id*. "A 'joint employer relationship' exists 'when two or more entities, according to common law principles, share significant control of the same employee.'" *Pappas v. XP Controle Participacoes S.A.*, No. 19-CV-11137, 2023 WL 317353, at *4 (S.D.N.Y. Jan. 18, 2023) (quoting *Felder*, 27 F.4th at 843). "This means that an entity other than the employee's formal employer is that employee's joint employer when it has power to pay an employee's salary, hire, fire, or otherwise control the employee's daily employment activities, such that [the court] may properly conclude that a constructive employer-employee relationship exists." *Id*. "[B]ecause the central principle guiding the analysis is the level of control, any relevant factor may be considered so long as it is drawn from the common law of agency and all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." *Chavannes v. Bronx Parent Hous. Network, Inc.*, No. 21-CV-05060, 2022 WL 4124762, at *3 (S.D.N.Y. Sept. 9, 2022). "These factors include 'control over an employee's hiring, firing, training, promotion, discipline, supervision, and handling of records, insurance and payroll.'" *Id*. (quoting *Felder*, 27 F.4th at 838).

The Second Circuit in *Felder* held, specifically and for the first time in the Title VII context, that to establish a joint employment relationship with an entity other than a plaintiff's direct employer, the plaintiff must show that the purported joint employer exercised "significant control" over the terms and conditions of the employee's employment. 27 F.4th at 844-845. Put simply, *Felder* requires a plaintiff demonstrate the purported joint employer exercised significant control over the plaintiff's employment, not just operational control or supervision over the plaintiff's formal employer. *Chavannes*, 2022 WL 4124762, at *5.[4] "[C]ourts 'have generally concluded that

---

[4] Any argument by Plaintiff that *Felder* does not apply to this franchisor-franchisee context (Pl. Br. at 10-12), is flatly rejected. If the Second Circuit intended that *Felder* apply only in limited circumstances, surely the panel would have so stated.

franchisors are not employers.'" *Rivers v. Int'l House of Pancakes*, No. 20-CV-02471, 2021 WL 860590, at *3 (S.D.N.Y. Mar. 8, 2021) (quoting *Cordova v. SCCF, Inc.*, No. 13-CV-05665, 2014 WL 3512838, at *4 (S.D.N.Y. July 16, 2014) (collecting cases)).

The record evidence in this case does not support a finding of joint employer liability. The Franchise Agreement specifically addresses the issue of control over Empire's employees and provides that Empire is exclusively responsible for "determining the terms and conditions of employment for all Hotel employees . . . [including] all decisions concerning the hiring, firing and discipline of Hotel employees, and for all other aspects of the Hotel's labor relations and employment practices." (Bharj Decl., Ex. 8-A). Empire uses its own employment applications, policies, handbook, and other employment documents. (56.1 Stmt. ¶ 31). Plaintiffs were both interviewed by Empire managers when they applied for their jobs, and Empire extended Plaintiffs their employment offers (*id*. ¶ 72; Robinson Tr. at 48:6-9; Bharj. Decl., Ex. 17, "RFA" ¶¶ 1-3). Empire set Plaintiffs' rate of pay (56.1 Stmt. ¶¶ 28, 74, 75); set their start dates (*id*. ¶ 72; Robinson Tr. at 48:6-13); awarded them pay raises (56.1 Stmt. ¶¶ 28, 75; Moody Tr. at 230:3-11; Robinson Tr. at 89:8-90:22); defined their job duties and responsibilities (56.1 Stmt. ¶¶ 25, 57, 73; Moody Tr. at 86:7-22, 108:7-9, 111:24-112:14, 177:21-178:6, 178:24-179:25; Robinson Tr. at 49:16-24); maintained their employment records, including personnel files (56.1 Stmt. ¶ 21; Bharj Decl., Ex. 19, "Khan Decl." ¶¶ 3, 8); controlled their work schedules and days off (Moody Tr. at 500:13-25; Robinson Tr. at 75:23-25, 215:2-19); issued their paychecks (56.1 Stmt. ¶ 28; RFA ¶ 4; Robinson Dep. 211:2-212:20); administered and directed their payroll (Bharj Decl., Ex. 13, "Khan Tr." at 37:7-21, 190:9-191:18); administered any disciplinary action (Bharj Decl., Ex. 8-A; 56.1 Stmt. ¶ 29); devised the employment policies and practices that they were required to follow (56.1 Stmt.

¶ 31; Bharj Decl., Ex. 4-C); and directed and supervised their daily work activities and assignments (56.1 Stmt. ¶ 25; Moody Tr. at 108:16-23, 178:2-179:25; Robinson Tr. at 75:17-22, 88:12-14).

The record also demonstrates that the Hyatt Defendants were not involved in any of those employment matters. (56.1 Stmt. ¶¶ 21, 22, 25, 28, 29, 31; *see generally* RFA). To the extent Plaintiffs argue that the one-week Brand Standards Training and franchise relationship between Hyatt and Empire supports a finding of joint employer liability, similar arguments have been rejected by other courts in the franchise context for the simple reason that, like here, the purported employer did not exercise sufficient control over the terms and conditions of the employee's employment. *See, e.g., Ocampo v. 455 Hosp. LLC*, No. 14-CV-09614, 2021 WL 4267388, at *8 (S.D.N.Y. Sept. 20, 2021), *aff'd sub nom. Ocampo v. Brown & Appel, LLC*, No. 21-2579-CV, 2022 WL 17684587 (2d Cir. Dec. 15, 2022); *Rivers*, 2021 WL 860590, at *3; *In Re Domino's Pizza, Inc.*, 16-CV-02492, 2018 WL 4757944, at *5-*9 (S.D.N.Y. Sept. 30, 2018) (Nathan, J.).

Based upon the foregoing, and drawing all inferences in Plaintiffs' favor, there is insufficient evidence in the record for a reasonable juror to conclude that the Hyatt Defendants are a joint employer. Indeed, the record is clear that the Hyatt Defendants did not exercise control over Moody or Robinson's employment – let alone *significant* control. Accordingly, the Hyatt Defendants are entitled to summary judgment dismissing Plaintiffs' claims against them in their entirety.[5]

## II.     Claims Against the Empire Defendants

Plaintiffs' first and second claims for relief allege race discrimination and retaliation under Title VII; the third claim for relief alleges race discrimination and retaliation in violation of 42

---

[5] Given the Court's determinations herein, it does not reach the Hyatt Defendants' alternative arguments as to Plaintiffs' claims against the Hyatt Defendants.

U.S.C. § 1981; the fourth claim for relief alleges race discrimination under the NYSHRL; the fifth claim for relief alleges aider and abettor liability under the NYSHRL against Khan; and the sixth claim for relief alleges retaliation under the NYSHRL. Plaintiffs have also merged into these claims a third theory: that they were subjected to a hostile work environment.[6]

A. Race Discrimination – Title VII, the NYSHRL, and Section 1981

Plaintiffs allege that they each suffered adverse employment actions on the basis of their race. "Claims of discrimination under Title VII are analyzed at the summary judgment stage under the burden-shifting test announced by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Howard v. City of New York*, 302 F. Supp. 2d 256, 260 (S.D.N.Y. 2004), *aff'd*, 363 F. App'x 805 (2d Cir. 2010). Phase one of the *McDonnell Douglas* test places upon the plaintiff the burden of establishing a *prima facie* case of discrimination by alleging that: "(1) [s]he is a member of a protected class; (2) [her] job performance was satisfactory; (3) [s]he was subject to an adverse employment action; [and] (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination based on race." *Woods v. Ruffino*, 8 F. App'x 41, 42 (2d Cir. 2001) (citing *McDonnell Douglas*, 411 U.S. at 802). Claims under Section 1981 and NYSHRL are analyzed using the same standard as Title VII claims.[7] *See Kirkland-Hudson v. Mount Vernon City*

---

[6] Plaintiffs' three theories of liability—discrimination, hostile work environment, and retaliation—ought to have each been raised as standalone claims for relief. *See Benson v. Westchester Med. Ctr.*, No. 20-CV-05076, 2022 WL 2702544, at *10 (S.D.N.Y. July 12, 2022) ("The third and sixth claims for relief—although generically labeled "discrimination" and concerning the ADA and Rehabilitation Act, respectively—identify, in a blunderbuss, immeasurably confusing pleading style, three separate theories of recovery. . . .").

[7] Several amendments to the NYSHRL, "the effect of which is to render the standard for claims closer to the standard of the [New York City Human Rights Law] . . . . only apply to claims that accrue on or after the effective date of October 11, 2019; they do not apply retroactively to Plaintiff's claims here." *Livingston v. City of New York*, 563 F. Supp. 3d 201, 233 (S.D.N.Y. 2021).

*Sch. Dist.*, No. 21-CV-0695, 2023 WL 2691622, at *14 (S.D.N.Y. Mar. 29, 2023) (citing *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 74-75 (2d Cir. 2016)).

If the plaintiff sets forth a *prima facie* case of discrimination, "the burden of production then shifts to the defendant to offer a legitimate, non-discriminatory rationale for the adverse employment action." *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 973 F. Supp. 2d 386, 397 (S.D.N.Y. 2013), *aff'd*, 586 F. App'x 739 (2d Cir. 2014) (quoting *McDonnell Douglas*, 411 U.S. at 802-03). "If the defendant articulates a legitimate reason for the action, the presumption of discrimination raised by the *prima facie* case drops out, and the plaintiff has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision and that the plaintiff's membership in a protected class was." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804).

### i.   *Moody*

The Empire Defendants argue that Moody fails to make out a *prima facie* disparate treatment claim because the actions alleged—having to wear a uniform, not getting her preferred scheduling or days off and, relatedly, having a harder workload than the other two kitchen employees, Trinidad and Hanan—are not adverse employment actions. They further argue that Moody was not demoted nor was she constructively discharged, and there can be no finding of an adverse action on those bases.

An "adverse employment action" is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003). Rather, it is "a materially adverse change in the terms and conditions of employment." *Galbaya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). Adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less

distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Terry*, 336 F.3d at 138.

"A disproportionately heavy workload could perhaps be an adverse action, if the additional work significantly changed the employee's responsibilities so as to diminish that worker's role or status, or exposed the worker to dangerous or extreme conditions not appropriate to her job classification." *Chacko v. Connecticut*, No. 07-CV-01120, 2010 WL 1330861, at *7 (D. Conn. Mar. 30, 2010). "Similarly, comparatively poor assignments can constitute adverse employment actions." *Edwards v. Huntington Union Free Sch. Dist.*, 957 F. Supp. 2d 203, 211 (E.D.N.Y. 2013). The Second Circuit has made clear, however, a plaintiff must show a material change and failure to produce evidence of a material change requires dismissal of the claim. *See Carter v. New Venture Gear, Inc.*, 310 F. App'x 454, 457 (2d Cir. 2009).

Moody testified that she believed her workload was heavier than Trinidad and Hanan, her co-workers in the kitchen, who were not African American. (Moody Tr. at 308:13-15, 328:1-11, 345:23-25, 348:18-21). However, she also testified that both African American and Hispanic employees were jointly doing the same work to help prepare the Hotel for opening and there was only one Caucasian employee who did not perform such work, a houseman whom she could not identify. (*Id*. at 142:10-146:6). Moody testified that that she was able to take days off before Trinidad left (when the kitchen had enough staff), that she was in charge of devising the work schedules after Trinidad left, and that Alam wanted to give her more time off as soon as the kitchen had more staff. (*Id*. at 180:8-10, 204:8-12, 184:9-185:21, 309:17-23). Indeed, recognizing Moody's hard work, Alam increased her pay to $15/hour. (*Id*. at 317:10-318:9; 56.1 Stmt. ¶¶ 74-75).

Moody has not produced evidence that the temporary change in work schedule was accompanied by any reduction of job title, salary, or benefit and has therefore failed to sufficiently demonstrate that she suffered a materially adverse employment action.  *Edwards*, 957 F. Supp. 2d at 212 ("Plaintiff has not produced any evidence of a change in title, a change in pay, an increase in hours worked, or a decreased ability to advance his career and has therefore failed to sufficiently demonstrate that he suffered a materially adverse employment action."); *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 255 (E.D.N.Y. 2012) (additional workload and undesirable assignments not adverse employment actions); *Rivera v. Potter*, No. 03-CV-01991, 2005 WL 236490, at *6 (plaintiff's subjective opinion about his working schedule does not qualify as an adverse action). *C*ompare *Little v. Nat'l Broad. Co.*, 210 F. Supp. 2d 330, 379 (S.D.N.Y. 2002) (a change in work schedule was an adverse employment action when it was accompanied by "an actual loss in income because of lost overtime" and where plaintiff "was forced to work undesirable shifts with an erratic schedule"); *Patrolmen's Benev. Ass'n of N.Y.C., Inc. v. City of New York*, 74 F. Supp. 2d 321, 336 (S.D.N.Y. 1999) (a change of work assignment accompanied by "loss of promotion opportunities and 'good-will' accrued among supervisors in their former precincts" was sufficient for the question of adverse employment action to be decided by a jury).

With respect to the uniform requirement, Moody testified that Trinidad and Hanan never received uniforms and were not required to wear them, that she had to wear a uniform, but that she was never formally reprimanded for failing to wear the uniform. (Moody Tr. at 208:20- 212:2, 213:18-214:2, 315:18-23). Moody has not produced evidence that she suffered any consequence, or any material change to her employment, in connection with the uniform requirement. "[R]eprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being

16

placed on probation." *Uddin v. City of New York*, 427 F. Supp. 2d 414, 429 (S.D.N.Y. 2006); *see also Guzman v. City of New York*, 93 F. Supp. 3d 248, 258 (S.D.N.Y. 2015) (no adverse action where plaintiff was sole pregnant employee required to wear uniform) (collecting cases).

Moody also contends that she was demoted in mid-July 2019. Moody testified that a few weeks after Trinidad quit mid-shift in the beginning of July 2019, Moody was promoted to kitchen manager. (Moody Tr. at 180:11-22; 184:12- 317:2-318:9). However, the day after Moody took one day off in mid-July, Trinidad was rehired as kitchen manager and Moody was demoted to cook. (*Id*. at 326:14-20). Moody did not receive a pay cut or any change in job responsibilities; indeed, she had the same responsibilities before the promotion to kitchen manager and after, but Moody did not return to work after the demotion, so there is no evidence of a change in job responsibilities following the demotion. (*Id*. at 327:8-9, 344:3-16). These facts are sufficient to at least raise an issue that Moody's demotion was an adverse employment action because, although her pay was not cut and there is no evidence that her responsibilities changed, the title of her position had diminished prestige. Further, that her managerial title was assumed by a newly rehired individual who was not African American could give rise to the inference of discrimination. *Williams v. All. Nat. Inc.*, 24 F. App'x 50, 53 (2d Cir. 2001). Empire does not offer any reason for the demotion, let alone a legitimate, non-discriminatory reason. Empire argues only that the change in title from kitchen manager to cook was unaccompanied by a reduction in pay or change in responsibilities, and therefore does not constitute a demotion. (Def. Br. at 21-22; Reply Br. at 6). The Court disagrees. Empire has not met its burden to establish a legitimate, non-discriminatory reason for Moody's demotion and therefore summary judgment must be denied.

Moody also asserts that she suffered an adverse employment action because she was constructively discharged. A constructive discharge is "functionally the same as an actual

termination" and therefore is considered an adverse employment action. *Pa. State Police v. Suders*, 542 U.S. 129, 148 (2004). "A constructive discharge cannot be proven merely by evidence that an employee disagreed with the employer's criticisms of the quality of [her] work, or did not receive a raise, or preferred not to continue working for that employer. Nor is the test merely whether the employee's working conditions were difficult or unpleasant." *Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993). A constructive discharge occurs only "when an employer intentionally creates a work atmosphere so intolerable that the plaintiff is forced to quit involuntarily." *Borski v. Staten Island Rapid Transit*, 413 F. App'x 409, 411 (2d Cir. 2011); *Terry*, 336 F.3d at 152.

The Second Circuit has developed a two-part test for evaluating claims of constructive discharge: "evidence (1) that the employer acted deliberately or intentionally in bringing about the complained of work conditions, and (2) that the conditions were intolerable." *Edwards*, 957 F. Supp. 2d at 213 (citing *Petrosino v. Bell Atl.*, 385 F.3d 210, 229 (2d Cir. 2004)). With respect to the first requirement, "the plaintiff must, at a minimum, show that the employer acted deliberately in bringing about the intolerable work conditions." *Id.* (citing *Petrosino*, 385 F.3d at 229-30). With respect to the second requirement, the conditions must be "assessed objectively by reference to a reasonable person in the employee's position." *Id.* (citing *Petrosino*, 385 F.3d at 230).

Moody contends she was constructively discharged because of the foregoing cited actions—having to wear a uniform, not getting her preferred scheduling or days off, having a harder workload than the other two kitchen employees, and her demotion—coupled with "the repeated unaddressed racial epithets by Sulollari." (Pl. Br. at 17-18, 23-24). These actions, according to Moody, made her feel "hurt and humiliated," causing her to resign. (*Id.* at 18). "[C]onstructive discharge requires more than the employee finding the employment environment

18

to be very uncomfortable—the work environment must be intolerable. *Edwards*, 957 F. Supp. 2d at 213. "[T]he standard is a demanding one, because a constructive discharge cannot be proven merely by evidence that an employee preferred not to continue working for that employer or that the employee's working conditions were difficult or unpleasant." *Miller v. Praxair, Inc.*, 408 F. App'x 408, 410 (2d Cir. 2010). "[R]outine disagreements with supervisors or mild criticisms . . . are simply insufficient to establish the sort of 'intolerable' working conditions necessary to a constructive discharge claim." *Id*. (citing *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983)). The events relied upon by Moody as adverse actions, discussed *supra*, are the sort of routine disagreements and mild criticisms that fail to rise to the level necessary to support a finding of a constructive discharge.

The only additional facts cited by Moody to support her claim that she was constructively discharged beyond the other events she relies upon as adverse actions concern Sulollari's use of "racist epithets" at the Hotel. (Pl. Br. at 18). Moody testified that Sulollari referred to her as "you people," understanding the phrase to refer to African American people based upon the context. (Moody Tr. at 376:18-377:8). "Although clearly inappropriate, these statements - even if racially charged - in no way approach the bar set for this type of cause of action." *Borrello v. Dep't of Corr. & Cmty. Supervision*, No. 17-CV-00919, 2020 WL 4928312, at *11 (W.D.N.Y. Mar. 11, 2020) (quoting *Pitts v. Howard University*, 111 F. Supp. 3d 9, 25 (D.D.C. 2015)), *adopted by* 2020 WL 4926515 (W.D.N.Y. Aug. 21, 2020). The use of the phrase "you people," in the context of the other alleged conduct relied upon by Moody, demonstrates that Sulollari did not treat Moody well. "However, it does not rise to the level necessary to maintain her claim." *Id*. at *12; *Liburd v. Bronx Lebanon Hospital Center*, No. 07-CV-11316, 2009 WL 900739, *1, 8 (S.D.N.Y. 2009) (concluding that referring to the plaintiff as "black ass" on several occasions, "in the context of

[the supervisor's] other alleged conduct . . . merely shows that [the supervisor] did not treat her well; it does not, however, rise to the level necessary to make out a hostile work environment claim"), *aff'd*, 372 Fed. Appx. 137 (2d Cir. 2010).[8] Accordingly, Moody has failed to provide sufficient evidence from which a jury could find that she was constructively discharged. *See, e.g., Miller*, 408 F. App'x at 410 (upholding the dismissal of a case on summary judgment for failure to produce evidence of an intolerable workplace).

Thus, based upon the foregoing, Moody's first, third, and fourth claims for relief alleging disparate treatment under Title VII, NYSHRL, and Section 1981 survive summary judgment only to the extent that her demotion in mid-July 2019 constitutes an adverse action giving rise to an inference of discrimination based on race, and are otherwise dismissed.

*ii.    Robinson*

Robinson contends that she suffered disparate treatment because she was required to wear a uniform, received a written warning after Singh frustrated her work schedule, was made to do more work than other employees who were not African American, was not provided with a security guard when she worked overnight shifts, and was constructively discharged.

With respect to the uniform requirement, Robinson testified that on one particular occasion during the period of time she worked at the front desk she was sent home by management for wearing leggings instead of her uniform pants. (Robinson Tr. at 109:13-15). She also testified, however, that her co-workers at the front desk which included individuals who are not African American, were also subject to the requirement that they wear a uniform. (*Id*. at 109:6-115:22).

---

[8] Although the authorities cited were analyzing the use of the phrase "you people" with respect to the plaintiffs' hostile work environment claims, it is well settled that the standard for constructive discharge is even higher. *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010); *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 251 (S.D.N.Y. 2001), *aff'd*, 51 F. App'x 55 (2d Cir. 2002). In other words, if such references and conduct cannot support a hostile work environment claim, they necessarily fail to establish a constructive discharge claim.

Robinson does not cite any evidence of a materially adverse employment action for her failure to wear a uniform, short of being sent home that day; she does not assert, for example, that her pay was reduced or that she was placed on probation as a result. The single instance recounted by Robinson of being sent home for failing to wear a required uniform, without more, does not constitute an adverse employment action. *Uddin*, 427 F. Supp. 2d at 429; *Guzman*, 93 F. Supp. 3d at 258.

With respect to scheduling, Robinson testified that Singh targeted her with scheduling anomalies, by adding her to the schedule after she had checked it before leaving for the day and refusing to answer her calls when she contacted him to determine when she was scheduled to work again. (Robinson Tr. at 97:3-98:3, 103:7-22, 121:7-17). Robinson testified that as a result of Singh's conduct, she was issued the September 7, 2019 written warning regarding absenteeism. (*Id*. at 168:17-169:11; Bharj Decl., Ex. 4-A). There is no evidence in the record, however, that she suffered any material alteration to her job duties as a result of the write-up, such as a demotion, decrease in salary, or suspension. Therefore, the write-up does not rise to the level of an adverse employment action. *Lambert v. Trump Int'l Hotel & Tower,* 304 F. Supp. 3d 405, 420 (S.D.N.Y. 2018); *see also Rivera*, 2005 WL 236490, at *6.

Robinson testified that she believed she was made to do more work than other employees who were not African American during the period she worked in housekeeping. (Robinson Tr. at 55:5-11, 136:12-22). However, Robinson could not identify any specific housekeepers who received more favorable treatment than her and other African American employees, instead generalizing that "[the Hispanic housekeepers] had less rooms than we did." (Robinson Dep. 55:9-11). Such generalizations do not suffice to defeat summary judgment. *Moore v. Am. Fed'n of State, Cnty. & Mun. Emps. Loc. 1095*, No. 17-CV-0704, 2022 WL 262347, at *10-11 (W.D.N.Y. Jan.

28, 2022), *adopted by*, 2022 WL 1497959 (W.D.N.Y. May 12, 2022), *aff'd*, No. 22-1123-CV, 2023 WL 4145004 (2d Cir. June 23, 2023). Robinson's testimony concerning the basis for her allegation that the imbalanced workload was racially-motivated was that "I feel like it was due to my race." (Robinson Tr. at 116:25-117:2). Robinson fails to offer proof in admissible form and beyond the four corners of her own mind necessary to create a triable issue of fact as to any inference of discrimination based on race. *Jackson v. Beacon City Sch. Dist.*, No. 19-CV-08164, 2022 WL 17904563, at *4 (S.D.N.Y. Dec. 23, 2022).

Robinson also argues she experienced race discrimination because when she worked the overnight shift at the front desk and asked that a colleague be scheduled to work with her because of security concerns, the Hotel refused her request, but agreed to the same request by a co-worker who is Caucasian. (Pl. Br. at 20; Robinson Tr. at 109:16-110:3). Robinson cites no case to support her position that the failure to schedule a colleague to work with her during an overnight shift amounts to an adverse employment action. There is simply no evidence of a materially adverse change in the terms and conditions of her employment as a result of this incident.

Robinson also contends, like Moody, that she was constructively discharged based upon the foregoing cited actions, coupled with "the repeated unaddressed racial epithets by Sulollari." (Pl. Br. at 17-18, 23-24). Robinson testified that Sulollari used the "N-word" in her presence on one occasion when Sullolari was exiting the room and not facing Robinson, when Robinson "was cleaning the room one day but it was just more like, it ignored because she came in to check my room. The room wasn't done how she wanted it to be done so it was more like, these people don't know what they are doing, and the N word came after, yes." (Robinson Tr. 129:16-23, 130:5-10). She further testified that she had overheard the "N-word" used by Sulollari ten times during the three-month period she was employed. (*Id*. at 131:13-21). The record does not contain evidence

of when Sulollari used the "N-word," whether it was directed to anyone, or any other details concerning the context.

"[C]onduct not directly targeted at or spoken to an individual but purposefully taking place in his presence can nevertheless transform his work environment into a hostile or abusive one." *Miller v. New York State Police*, No. 20-3976, 2022 WL 1133010, at *2 (2d Cir. Apr. 18, 2022). "For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments. Thus, whether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment." *Id.* (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110-11 (2d Cir. 1997)).

As discussed *supra* with respect to the conduct relied upon by Moody, Sullolari's use of the "N-word," in the context of the other alleged conduct relied upon by Robinson, demonstrates that Sullolari did not treat Robinson well. "However, it does not rise to the level necessary to maintain her claim." *Borrello*, 2020 WL 4928312, at *12; *Liburd*, 2009 WL 900739, *1, 8. Although there can be no doubt that the use of the "N-word" in any environment, and certainly in the work environment, is loathsome, offensive, and patently unnecessary, consideration of the cumulative evidence produced on this motion does not meet the standard to find the existence of a hostile—or for purposes of this assertion of a constructive discharge, intolerable—work environment. *Miller*, 408 F. App'x at 410; *Miller*, 2022 WL 1133010, at *2 (finding 12 incidents over three years where [plaintiff's supervisor] called African Americans "animals" or "savages," used a mocking voice, used the "N-word" in a Facebook post, and remarked that an African American "had a great body for monkey sex" did not constitute a hostile work environment).

Accordingly, Robinson has likewise failed to provide sufficient evidence from which a jury could find that she was constructively discharged.

Robinson's disparate treatment claim thus cannot survive summary judgment as the record does not demonstrate any materially adverse employment action occurring under circumstances giving rise to an inference of discrimination based on race.

Accordingly, the Empire Defendants' motion for summary judgment dismissing Robinson's disparate treatment claims is granted.

B.  <u>Hostile Work Environment</u>

Plaintiffs also allege in the first claim for relief that they suffered a hostile work environment. As set forth *supra*, Plaintiffs have not raised a triable issue of fact to overcome summary judgment as to this theory. To establish a hostile work environment under Title VII, "a plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn v. City of New York*, 795 F.3d 297, 320-21 (2d Cir. 2015). Plaintiffs rely on the same arguments and allegations to support this theory as made in connection with their disparate treatment claim. (Pl. Br. at 21). As previously noted, the evidence in this record does not support a finding of an "intolerable" workplace that would enable a trier of fact to conclude that Plaintiffs were constructively discharged. Because the standard for constructive discharge is even higher than that applicable to hostile work environment claims, Plaintiffs' hostile work environment claim fails as a matter of law. *Fincher*, 604 F.3d at 725; *Bennett*, 136 F. Supp. 2d at 251.

Accordingly, the Empire Defendants' motion for summary judgment dismissing Plaintiffs' hostile work environment claim is granted.

C.  Retaliation

To make out a *prima facie* case of retaliation, "a plaintiff must demonstrate that (1) she engaged in protected activity, (2) the defendant was aware of that activity, (3) she was subjected to a retaliatory action, or a series of retaliatory actions, that were materially adverse, and (4) there was a causal connection between the protected activity and the materially adverse action or actions." *Carr v. New York City Transit Auth.*, --- F.4th ---, 2023 WL 5005655, at *5 (2d Cir. Aug. 7, 2023); *see also Ninying v. New York City Fire Dep't*, 807 F. App'x 112, 115 (2d Cir. 2020).

A plaintiff must show "that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013). "This but-for reason need not be the only cause for the employer's action; however, the plaintiff must show that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* at 846; *D'Andrea v. Nielsen*, 765 F. App'x 602, 605 (2d Cir. 2019). Even under this but-for standard, causation can be proven either: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y. City Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir. 2000); *see also Zann Kwan*, 737 F.3d at 845 ("[T]he but-for causation standard does not alter the plaintiff's ability to demonstrate causation at the *prima facie* stage on summary judgment or at trial indirectly through temporal proximity."). Once a plaintiff has established a *prima facie* showing of retaliation, the burden then shifts to the defendant to proffer a legitimate, non-retaliatory reason for the adverse employment action. *Zann Kwan*, 737 F.3d at 845. The plaintiff must then demonstrate that the non-retaliatory reason is a mere pretext for retaliation. *Id.*

Plaintiffs allege as their second and fifth claims for relief that the Empire Defendants retaliated against them for making continual complaints to management and Khan about discrimination at the Hotel, and meeting with an attorney and co-workers to discuss legal options related to their claims of discrimination. (Am Compl. ¶¶ 52-55; Pl. Br. at 25). They argue that the Empire Defendants "engaged in a number of actions in retaliation against Plaintiffs, including frustrating work schedules, and demoting Moody," and refer the Court to their argument in their opposition brief concerning their claim of disparate treatment. (Pl. Br. at 25). The Court has already conclusively determined that none of the actions cited by Plaintiffs constitute adverse employment actions except for Moody's demotion. Accordingly, only Moody's demotion satisfies the third element of a *prima facie* retaliation case.

Although Moody's argument with respect to her retaliation claims leaves much to be desired, it would appear that the protected activity in which Moody engaged that subjected her to the demotion was her reporting to Soto the animus displayed by Sulollari and advising Soto that she had complained to an attorney about workplace issues at the Hotel. (Moody Tr. at 374:4-17; Soto Tr. at 194:14-196:7). Soto, in turn, reported this information to Alam. (Soto Tr. at 193:13-195:15). Alam ultimately demoted Moody. (Moody Tr. at 231:12-232:17, 326:14-20). The Empire Defendants argue that Moody simply speculates that her protected activity and the demotion are related, and that she fails to establish a causal link between the two. (Reply Br. at 8-9).

"At the most basic level, defendants' allegedly retaliatory actions must occur later in time than plaintiffs' protected speech." *Santucci v. Levine*, No. 17-CV-10204, 2021 WL 76337, at *7 (S.D.N.Y. Jan. 8, 2021) (quotation marks omitted), *aff'd*, 2022 WL 121281 (2d Cir. Jan. 13, 2022). The record reflects that Soto's reporting to Alam occurred on or about July 13, 2019. (Soto Tr. at 193:13-195:15). The record also reflects that prior to Moody's resignation on July 17, 2019, Alam

demoted her. (Moody Tr. at 231:12-232:17, 326:14-20; 56.1 Stmt. ¶ 85). The date of Moody's demotion, however, is not at all clear from this record.[9] It is possible that Moody was demoted shortly after Alam was advised of Moody's protected activity;[10] but it is just as possible that the demotion occurred *before* the protected activity.

"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Moody's failure to produce any evidence of a causal connection between the protected activity and the materially adverse action constitutes a failure of proof and is insufficient to create a genuine dispute of material fact. Under these circumstances, the Empire Defendants are entitled to judgment as a matter of law on Plaintiffs' second and fifth claims for relief.

III.   Individual Liability

Unlike Title VII, Section 1981 and the NYSHRL provide for individual liability. In general, to prove individual liability based on either of these claims for relief, a plaintiff most show

---

[9] Plaintiff alleged in the Amended Complaint that she was demoted when she arrived to work on July 19, 2019. (Am. Compl. ¶ 42). However, the record evidence demonstrates that Moody's last day of work was July 17, 2019. (56.1 Stmt. ¶ 85). It does not appear that any of the parties have included this most basic fact—the date of Moody's demotion—in the thousands of pages of briefing and exhibits submitted on this motion. Although the Court has thoroughly reviewed the record here, it bears noting that parties "cannot simply dump papers on the court and expect the court to sift through them to determine if some nugget is buried somewhere in that mountain." *Emanuel v. Gap.*, No. 19-CV-03617, 2022 WL 3084317, at *5 (S.D.N.Y. Aug. 3, 2022) (quoting *Mirza v. Garnet Health*, No. 20-CV-00556, 2022 WL 826410, at *2 n.6 (S.D.N.Y. Mar. 17, 2022)). "Judges are not like pigs, hunting for truffles buried in briefs or the record." *Sea Trade Mar. Corp. v. Coutsodontis*, No. 09-CV-00488, 2015 WL 4998638, at *4 (S.D.N.Y. Aug. 20, 2015).

[10] While evidence of such temporal proximity might have made out a *prima facie* case of retaliation, it is axiomatic that "temporal proximity alone is insufficient to defeat summary judgment at the pretext stage." *Carr*, 2023 WL 5005655, at *7.

that the individual was personally involved in the alleged violations of rights. *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004) (Section 1981); *Feingold v. New York*, 366 F.3d 138, 157 (2d Cir. 2004) (NYSHRL). The Second Circuit has held that a plaintiff seeking to impose individual liability under Section 1981 must demonstrate "some affirmative link to employment discrimination," *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000), and under the NYSHRL, the plaintiff must demonstrate the defendant "actually participate[d] in the conduct giving rise to a discrimination claim," *Feingold*, 366 F.3d at 189-59.

Given the Court's determinations herein, the only surviving allegations against Khan—the sole individual defendant in this case—are Moody's disparate treatment claims under Section 1981 and the NYSHRL concerning her demotion. Although she argues that she complained numerous times to Khan that Hanan failed to follow standard food safety protocols and regularly left food and dirty dishes out at the end of her shift for Moody to be forced to clean (Pl. Br. at 7), Moody has not alleged, nor has she established through the admissible record, that Khan had any personal involvement in her demotion or in rehiring an individual who was not African American to assume Moody's managerial title. (*See, e.g.,* Moody Tr. at 233:3-9). She does not argue or point to any evidence that Khan actually participated in the conduct giving rise to this surviving discrimination claim. There simply is no affirmative link evidenced by this record between Khan and Moody's employment discrimination claim.

Accordingly, Khan is entitled to summary judgment dismissing the claims alleged against him.

## CONCLUSION

For the foregoing reasons, the Hyatt Defendants' motion for summary judgment (Doc. 82) is GRANTED. The Empire Defendants' motion for summary judgment (Doc. 81) is GRANTED IN PART. Plaintiff Robinson's claims are dismissed in their entirety. Plaintiff Moody's claims are dismissed, except the first, third, and fourth claims for relief alleging disparate treatment under Title VII, NYSHRL, and Section 1981, but only to the extent that her demotion in mid-July 2019 constitutes an adverse action giving rise to an inference of discrimination based on race. All claims alleged against Khan are dismissed.

The parties are directed to meet and confer and comply with the Court's Individual Practices (rev. June 23, 2023) Rules 6(A) and 6(B) by filing the documents required therein, which include a joint pretrial order, proposed joint *voir dire* questions, joint requests to charge, joint verdict form, and motions *in limine*, on or before October 24, 2023.

A pretrial conference has been scheduled for **November 30, 2023 at 3:30 p.m.** to be held in Courtroom 520 of the courthouse located at 300 Quarropas Street, White Plains, New York 10601.

The request to seal (Doc. 89) the unredacted documents filed under seal at Doc. 91 is GRANTED, and the redacted documents filed at Docs. 84 and 86 will remain the publicly-filed versions of those documents.

The Clerk of Court is respectfully requested to terminate the pending motion sequences (Doc. 81; Doc. 82; Doc. 89); and terminate Hyatt Corporation, Hyatt Place Franchising, L.L.C., Hyatt Hotels Corporation, and Erfan Khan as defendants.

Dated: White Plains, New York
      August 24, 2023

SO ORDERED:

_____

Philip M. Halpern
United States District Judge